IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TYRONE ORANGE,                    )
                                  )
            Plaintiff,            )
                                  )
v.                                )        CIVIL ACTION NO. 17-0281-MU
                                  )
NANCY A. BERRYHILL,               )
Acting Commissioner of Social     )
Security,                         )
                                  )
            Defendant.            )


## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Tyrone Orange brings this action, pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of

Social Security ("the Commissioner") denying his claim for Supplemental Security

Income ("SSI"), based on disability, under Title XVI of the Act. The parties have

consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28

U.S.C. § 636(c), for all proceedings in this Court. (Doc. 20 ("In accordance with

the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73, the parties in this case

consent to have a United States Magistrate Judge conduct any and all

proceedings in this case, … order the entry of a final judgment, and conduct all

post-judgment proceedings.")). *See also* Doc. 22. Upon consideration of the

administrative record, Orange's brief, the Commissioner's brief, and the

arguments made at the hearing on January 30, 2018 before the undersigned

Magistrate Judge, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

## I.  PROCEDURAL HISTORY

Orange applied for SSI, based on disability, under Title XVI of the Act, 42 U.S.C. §§ 1381-1383d, on April 3, 2014, alleging disability beginning on October 19, 1990. (Tr. 169). His application was denied at the initial level of administrative review on July 9, 2014. (Tr. 86). On August 11, 2014, Orange requested a hearing by an Administrative Law Judge (ALJ). (Tr. 93). During the initial hearing that was held on December 18, 2015, the ALJ stated that she would order a consultative psychological evaluation of Orange. (Tr. 62). After the evaluation was performed, a supplemental hearing was held on May 17, 2016. (Tr. 37). After the hearing, the ALJ issued an unfavorable decision finding that Orange was not under a disability from the date the application was filed through the date of the decision, October 28, 2016. (Tr. 17-31). Orange appealed the ALJ's decision to the Appeals Council, and, on May 16, 2017, the Appeals Council denied his request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

After exhausting his administrative remedies, Orange sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on September

---

[1] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 20. ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

18, 2017. (Docs. 10, 11). Both parties filed briefs setting forth their respective positions. (Docs. 12, 18). Oral argument was held on January 30, 2017. (Doc. 21). The case is now ripe for decision.

## II.  CLAIM ON APPEAL

Orange alleges that the ALJ's decision to deny him benefits is in error for the following reason:

1. The ALJ erred by failing to properly evaluate whether his impairment is of a severity to meet or equal Listing 12.05C. (Doc. 12 at pp. 1-2).

## III. BACKGROUND FACTS

Orange was born on October 19, 1982, and was 31 years old at the time he filed his claim for benefits. (Tr. 185). Orange initially alleged disability due to emotional issues and mental retardation. (Tr.190, 195). Orange was in special education classes and dropped out of school after 8th grade. (Tr. 191). He has never worked. (Tr. 190).[2] Orange handles his personal care (although there is some evidence not always well). (Tr. 198; 315). He has never cooked or done any inside or outside household chores. (Tr. 199-200). He does not have a driver's license because he cannot read. (Tr. 200). He stated that he spends time on a daily basis walking, watching television, or playing basketball. (Tr. 201). He stated in his Function Report that he has problems getting along with family, friends, and others because he gets confused and very depressed and that he has problems paying attention, following instructions, and getting along with authority figures. (Tr. 202-03).  After conducting two hearings, the ALJ made a

---

[2] According to his own report to Dr. Starkey, Orange has spent a total of approximately 6 ½ years incarcerated. (Tr. 314).

determination that Orange had not been under a disability during the relevant time period, and thus, was not entitled to benefits. (Tr.17-31).

## IV. ALJ'S DECISION

After considering all of the evidence, the ALJ made the following findings that are relevant to the issues presented in her November 2, 2016 decision:

**1. The claimant has the following severe impairments: borderline intellectual functioning; personality disorder; and history of substance abuse, not material (20 CFR 416.920(c)).**

The claimant's impairments are severe because they impose upon him more than minimal functional limitations.

**2. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 416.920(d), 416.925 and 416.926).**

The objective record before the undersigned fails to contain the objective findings and clinical signs set forth in any of the listing sections pertaining to the claimant's severe impairments.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.05, and 12.08.

\* \* \*

Turning back to listing 12.05, the requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. In this case, these requirements are not met because the claimant can perform personal and self-care activities. As for the "paragraph B" criteria, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less. Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. A thorough and complete analysis of Listing Section 12.05 will be made in the body of the decision.

* * *

The treatment record references the claimant's history of intelligence testing with the Board of School Commissioners of Mobile County in 1992 that revealed his verbal IQ of 70, performance IQ of 52, and full scale IQ of 57, as well as testing in 1996 that disclosed a verbal IQ of 56, performance IQ of 53, and full-scale IQ of 50 (Exhibit IF). The undersigned also references the claimant's treatment notations from Kilby Correctional Facility in 2006 reflecting his history of assessment of antisocial and schizotypal personality, as well as alcohol addiction and cocaine use history. Notations from 2006 further referenced the claimant's diagnosis of substance-induced mood disorder. The claimant's estimated mild to borderline mental deficiency was also cited (Exhibit 2F).

In June 2014, the claimant presented for a psychological consultative evaluation with Jennifer M. Jackson, Psy.D., who noted his reports of placement in special education classes and problems with reading and spelling. The claimant informed that he quit school after completing the eighth grade and that he never earned a GED. He further informed that he could not read, write, or do arithmetic "that good" and could not count money or make change well enough to shop independently, but that he could stay at home unsupervised. While the claimant informed that he received counseling as a child, he also denied receiving any treatment thereafter. The claimant reported that he currently lived with his aunt; that he had never been employed; and that he had been arrested several times and that his last release was March 6, 2014. He denied abuse of alcohol and use of any other drugs. On examination, the claimant had an appropriate mood and affect and was oriented to place and person. He was not able to subtract serial 7's correctly; could not complete simple subtraction; and reported that he did not know how to count backward from 20 to 1 (and would not try). He completed a simple addition problem, but was not able to spell "world" correctly. Dr. Jackson noted that the claimant could recall four digits forward and stated that he did not know how to repeat digits backward (and would not try). According to Dr. Jackson, the claimant could recall no objects after five minutes; however, she found that his recent and remote memory were without substantial deficit. Dr. Jackson noted deficits in the claimant's fund of information, and she indicated that his judgment seemed poor and that that he appeared to have little insight into himself and his condition. The claimant described his daily activities as watching television, sitting at home, going outside some, and taking a bath about three times a week. Although the claimant reported that he could complete all personal activities of daily living independently, he

also stated that he did not know how to wash dishes, sweep, mop, vacuum, make a bed, clean a bathroom, cook, or do laundry. The claimant noted that he knew how to drive, but that he did not have a driver's license. No intelligence testing was performed by Dr. Jackson, who also assigned no diagnosis on Axis I (Exhibit 4F).

The treatment record referenced a singular notation with Altapointe Health Systems dated August 27, 2014, at which visit it was noted that the claimant presented for assessment after referral by his lawyer and psychiatrist. The claimant reported having "bad nerves", anger, and thoughts of "real bad stuff" such as hurting himself or hurting someone else. He also reported a history of alcohol abuse, but denied substance use since going to prison three years earlier. He noted that he was on probation for manslaughter and that his disability was discontinued while in prison. According to the claimant, he was considered mentally disabled and in special education classes. The claimant also reported that he saw shadows out of the corner of his eye and heard voices primarily when he was angry, but that he had not been on any mental health medications or obtained mental health treatment since he was young. The evaluator stated that, based on the claimant's report and presentation, he did not appear to meet the criteria for a severe mental impairment, noting that he did not present with negative symptoms or responses to internal stimuli that would indicate a formal thought disorder. It was noted that the claimant's reports of mood instability could be due to a personality disorder or adjustment disorder after his release from prison. The evaluator further indicated, however, that the claimant was relatively open about his need to resume disability. Mental status evaluation from the claimant's singular treatment visit displayed his normal and cooperative behavior, appropriate appearance, normal mood, and affect that was appropriate to the situation. He denied suicidal and homicidal ideation. The claimant was also noted to have poor sleep; perceptions within normal limits; unimpaired memory; logical and coherent thoughts; fair insight and judgment; no impairment in concentration; and no anxiety (Exhibit 5F).

In February 2016, the claimant presented for a consultative psychological evaluation with Kenneth Randall Starkey, Psy. D., and complained of problems with learning. He denied having any other medical or psychiatric concerns that might limit his employment. The claimant additionally informed Dr. Starkey that he was in special education classes from 3rd through 8th grade, noting that he repeated the 1st grade. The claimant denied having ever received formal psychiatric care at any time in his lifetime and reported that he took no prescribed medication, including currently. The claimant also informed

Dr. Starkey that he could feed, bathe, groom, and dress himself and could manage small amounts of money, prepare simple meals, shop for small items, use a telephone, use a microwave oven, and meet basic transportation needs all without assistance (although he had never held a valid driver's license). During mental status evaluation, it was noted that the claimant's motivation for attending to tasks appeared adequate. He was alert and oriented to person, place, time, day, date, and purpose of the meeting. Dr. Starkey found that the claimant was able to focus and sustain attention, but that he had mild and intermittent distraction from extraneous stimuli. Nevertheless, according to Dr. Starkey, the claimant's attention and immediate memory appeared generally adequate. His recent and remote memory were reported without significant difficulty. While the claimant completed the serial 3's task without error, he could not accurately spell WORLD backwards. He completed simple addition and subtraction problems correctly. Although Dr. Starkey observed that the claimant's thinking was rational, he also indicated that there was evidence of at least mild deficits for reasoning and judgment. Dr. Starkey found no evidence of delusional thought processes or paranoia and no evidence of tangential thinking, loosening of associations, or flight of ideas. Dr. Starkey also detected no evidence of auditory or visual hallucinations and found that the claimant's mood was somewhat irritable (with his affect being congruent with his mood). The claimant's insight and judgment appeared somewhat limited (Exhibit 6F).

The claimant was administered the Wechsler Adult Intelligence Scale-IV by Dr. Starkey with results displaying his full-scale IQ score of 70, verbal comprehension index score of 72, perceptual reasoning index score of 75, working memory index score of 77, and processing speed index score of 74. Dr. Starkey reported that the claimant's scores appeared to be an accurate estimate of his true intellectual abilities. Regarding daily activities, the claimant informed Dr. Starkey that he watched television; sometimes took out the trash; listened to music; sometimes went to the grocery store; went to the probation office once a month; and went to visit friends or his mother. Dr. Starkey diagnosed the claimant with alcohol use disorder (active); antisocial personality disorder (moderate); and borderline intellectual functioning (lower end of the range), along with a GAF of 61. According to Dr. Starkey, the claimant's overall prognosis appeared guarded from a psychological perspective; however, he noted that some improvement of prevailing symptoms might occur with total abstinence from alcohol and outpatient counseling. Dr. Starkey opined that the claimant's prevailing symptoms created moderate impairment of overall functioning, and he

concluded that, given the seemingly enduring nature of prevailing deficits for reasoning, judgment, and academic skills, significant change in the foreseeable future appeared unlikely. He reiterated that such limitations might be reduced with total abstinence from alcohol and cannabis and with six months of weekly outpatient counseling. In summary, Dr. Starkey concluded that the claimant's ability to understand, remember, and carry out simple/concrete instructions appeared adequate (but he would likely have difficulty with more complex instructions or those requiring other than basic literacy skills). Dr. Starkey opined that the claimant's ability to work independently vs. with close supervision appeared adequate at the present time, but that he would require close supervision to assure adequate completion of more complex tasks. Additionally, Dr. Starkey concluded that the claimant's ability to work with supervisors, co-workers, and the general public and ability to deal with pressures common to most work environments appeared marginal to poor currently. Finally, Dr. Starkey noted that the claimant might require some assistance for managing larger sums of money and for meeting more extensive transportation needs (Exhibit 6F).

In his medical source statement, Dr. Starkey concluded that the claimant possessed no limitation on his ability to understand and remember simple instructions and to carry out simple instructions. Dr. Starkey also opined that the claimant possessed a mild limitation on his ability to make judgments on simple work-related decisions and moderate restrictions on his ability to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. Additionally, Dr. Starkey concluded that the claimant possessed a mild limitation on his ability to interact appropriately with the public; a mild limitation on his ability to interact appropriately with co-workers; and a moderate limitation on his ability to interact with the supervisors and to respond appropriately to usual work situations and changes in a routine work setting (Exhibit 6F).

In evaluating the claimant's allegations in treatment notations and at his hearings of "bad nerves", anger, thoughts of hurting himself, and difficulty getting along with people, the undersigned references the findings of consultative evaluator Dr. Jackson, who noted his appropriate mood and affect and orientation to place and person. Although she indicated that his judgment seemed poor and that he appeared to have little insight into himself and his condition, Dr. Jackson's mental status evaluation failed to disclose substantial deficits, including regarding attention and concentration. Dr. Jackson

failed to assign any functional limitations on the claimant's mental capabilities after conducting a thorough evaluation and did not assess a medical condition on Axis I.

The claimant informed Dr. Jackson that he did not receive mental health treatment after receiving counseling as a child, and the current treatment record disclosed that he obtained treatment on only one occasion during the period for consideration; i.e., at Altapointe Health Systems in August 2014. Although the claimant reported at this visit that he saw shadows out of the corner of his eye and heard voices primarily when he was angry, the evaluator stated that he did not appear to meet the criteria for a severe mental impairment. Moreover, notations disclosed that the claimant had not been on any mental health medications or obtained mental health treatment since he was young. The evaluator further noted that the claimant was relatively open about his need to resume disability, however. Mental status evaluation from the claimant's singular treatment visit displayed primarily normal findings, including normal mood, normal perceptions, logical and coherent thoughts, and no impairment in concentration. The claimant failed to present again to Altapointe Health Systems for mental symptomatology, and the treatment record also failed to indicate that he obtained treatment with any other mental health facility or mental health professional.

Dr. Starkey noted the claimant's complaints of problems learning and denial of any other psychiatric concerns that might limit his employment. The claimant denied having ever received formal psychiatric care at any time in his lifetime and reported that he took no prescribed medication, including currently. Dr. Starkey found no evidence of delusional thought processes or paranoia and no evidence of tangential thinking, loosening of associations, or flight of ideas. Dr. Starkey also detected no evidence of auditory or visual hallucinations and found only that the claimant's mood was somewhat irritable (with his affect being congruent with his mood) and that his insight and judgment appeared somewhat limited. Dr. Starkey diagnosed the claimant with antisocial personality disorder of a moderate nature and assigned a GAF of 61, indicative of the low end of mild symptomatology (and close to moderate). After considering the foregoing evidence related to the claimant's personality disorder, including the lack of ongoing counseling and normal findings when treatment was obtained, the undersigned fails to find evidence of substantial functional limitations with respect to the condition.

Regarding the claimant's intellectual capabilities, the undersigned

acknowledges that he quit school after completing the eighth grade; that he was placed in special education classes from 3rd through 8th grade; that he repeated the 1st grade; and that he never earned a GED. The undersigned also acknowledges the claimant's complaints at various evaluations and at his hearings of difficulties with reading, spelling, writing, and arithmetic. The undersigned further notes the claimant's history of treatment records from Kilby Correctional Facility that referenced his estimated mild to borderline mental deficiency (Exhibit 2F).

Dr. Jackson noted that the claimant was not able to perform serial 7's and simple subtraction. She further noted that he could not perform some other mental tasks, but added that on a few occasions he would not even try. However, Dr. Jackson found that the claimant's recent and remote memory were without substantial deficit and that mental status evaluation generally failed to disclose substantial deficits, including regarding attention and concentration. Dr. Starkey found that the claimant was able to focus and sustain attention, but that he had mild and intermittent distraction from extraneous stimuli. Nevertheless, according to Dr. Starkey, the claimant's attention and immediate memory appeared generally adequate and his recent and remote memory were reported without significant difficulty. Although Dr. Starkey observed that the claimant's thinking was rational, he also indicated that there was evidence of at least mild deficits for reasoning and judgment. The undersigned finds no evidence of greater than moderate limitation from Dr. Starkey's mental status evaluation of the claimant. The undersigned notes that Dr. Starkey administered the WAIS-IV, disclosing the claimant's full-scale IQ score of 70, verbal comprehension index score of 72, perceptual reasoning index score of 75, working memory index score of 77, and processing speed index score of 74. Dr. Starkey diagnosed the claimant with borderline intellectual functioning (lower end of the range). The undersigned notes the claimant's description to Dr. Jackson of limited activities of daily living, pointing out that he denied knowing how to do chores. He admitted that he knew how to drive, but that he did not have a driver's license. The claimant described a broader range of activities of daily living to Dr. Starkey, including that he could manage small amounts of money, prepare simple meals, shop for small items, use a telephone and microwave oven, and meet basic transportation needs all without assistance. The claimant also noted that he sometimes took out the trash; sometimes went to the grocery store; went to the probation office once a month; and went to visit friends or his mother. Although the claimant informed Dr. Jackson that he could not count money or make change well enough to shop independently, certain treatment

and other notations provided some contradiction to those reports. As noted, the claimant informed Dr. Starkey that he sometimes went to the grocery store. Further, Function Reports of record established that he could handle finances at least sometimes.

The undersigned grants partial weight to the evaluation of Dr. Starkey, granting great weight to his mental status findings and intelligence testing. However, his conclusion that the claimant's overall prognosis appeared guarded appears to have been based in part on the claimant's substance use or abuse, of which the undersigned has failed to find ongoing evidence throughout the period for consideration. Nevertheless, Dr. Starkey still opined that the claimant's prevailing symptoms created *moderate* impairment of overall functioning. In addition to concurring with Dr. Starkey's conclusion that the claimant possessed moderate impairment of functioning, the undersigned grants great weight to Dr. Starkey's conclusion that the claimant's ability to understand, remember, and carry out simple/concrete instructions appeared adequate, in that such opinions were supported by intelligence testing, mental status findings, and the evaluation of Dr. Jackson. The undersigned also finds that Dr. Starkey's opinion that the claimant's ability to work independently vs. with close supervision was adequate was well-supported by the objective treatment record. However, the undersigned grants little weight to Dr. Starkey's opinion that the claimant's capabilities with respect to social interactions and dealing with work pressures was "marginal to poor", in that such terms were vague and not quantifiable. Instead, the undersigned finds that the limitations regarding such duties as reported in Dr. Starkey's accompanying medical source statement were clearly stated and consistent with the current treatment record. Therefore, the undersigned assigns great weight to Dr. Starkey's conclusions that the claimant possessed mild limitation on his ability to interact appropriately with the public; mild limitation on his ability to interact appropriately with co-workers; and moderate limitation on his ability to interact with supervisors and to respond appropriately to usual work situations and changes in a routine work setting. The undersigned additionally finds that Dr. Starkey's conclusions that the claimant possessed no limitation on his ability to understand and remember simple instructions and to carry out simple instructions, as well as his opinion that the claimant possessed mild limitation on his ability to make judgments on simple work-related decisions, were consistent with his mental status findings, intelligence testing, Altapointe notations, and the evaluation of Dr. Jackson. The undersigned further notes that such conclusions were consistent with the claimant's history of notations with Alabama Department of Correction

referencing recommendations in June 2006 that he participate in the GED and trade program (Exhibit 7F).

The undersigned has fully considered the treatment record related to the claimant's personality disorder and borderline intellectual functioning and finds no greater than moderate resulting functional limitations. The undersigned has specifically considered the claimant's hearing testimony as to social interaction, as well as treatment documentation regarding his personality disorder, and finds that the residual functional capacity determination herein provides for reasonable limitations that could be expected to result from his personality disorder as documented in the record. The residual functional capacity statement also adequately provides for reasonable limitations resulting from his assessed borderline intellectual functioning. Considering the claimant's borderline intellectual functioning and personality disorder, the undersigned finds that the claimant has the capacity to perform simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes; can have occasional and non-transactional interaction with the general public; can have occasional interaction with co-workers and supervisors; and is able to sustain concentration and attention for two-hour periods.

**BASED ON THE FOREGOING, THE UNDERSIGNED SPECIFICALLY FINDS THAT THE CLAIMANT HAS NOT DEFINITEVELY ESTABLISHED THAT HE HAS MET THE REQUIREMENTS OF ANY SECTION SET FORTH IN LISTING SECTION 12.05. THE UNDERSIGNED, IN CONDUCTING AN ANALYSIS UNDER SECTION 12.05, IS NOT REQUIRED TO FIND THAT THE CLAIMANT IS MENTALLY RETARDED BASED ON RESULTS OF IQ TESTING ALONE. INSTEAD, AN ADMINISTRATIVE LAW JUDGE IS REQUIRED TO EXAMINE THE IQ RESULTS IN CONJUNCTION WITH OTHER MEDICAL EVIDENCE AND THE CLAIMANT'S DAILY ACTIVITIES AND BEHAVIOR. SEE POPP V. HECKLER, 779 F.2D 1497 (11th CIR. 1986). CONSIDERING THE ENTIRETY OF THE RECORD, AS EXPLAINED ABOVE, THE UNDERSIGNED CONCLUDES THAT THE CLAIMANT'S DOCUMENTED IQ SCORE OF 70 IS NOT A TRUE ESTIMATE OF HIS ABILITIES. THE UNDERSIGNED IS COGNIZANT OF THE CLAIMANT'S LIMITED EDUCATION AND PREVIOUS PLACEMENT IN SPECIAL EDUCATION CLASSES. HOWEVER. IN ADDITION TO THE RECORD FAILING TO SHOW SUBSTANTIAL DEFICIT IN THE CLAIMANT'S CONCENTRATION, PERSISTENCE, OR PACE (WITH NO EVIDENCE OF MARKED LIMITATION IN THAT AREA OF FUNCTIONING), THERE IS ALSO NO INDICATION FROM THE RECORD THAT THE CLAIMANT'S LIMITED PERFORMANCE**

**OF ACTIVITIES OF DAILY LIVING IS THE RESULT OF INTELLECTUAL
DEFICITS. THERE IS CLEARLY NO EVIDENCE OF MARKED LIMITATION
IN THE CLAIMANT'S ACTIVITIES OF DAILY LIVING, NOR DOES THE
RECORD CONTAIN EVIDENCE OF MARKED LIMITATION IN THE
CLAIMANT'S SOCIAL FUNCTIONING.**

The undersigned addresses the objection of the representative to the
consultative evaluation of Dr. Starkey, as well as the representative's
assertion that the claimant's impairments meet Listing Section 12.05,
given the previous intelligence testing when he was 14 and a finding of
disability in 1990. In addition to asserting the reasoning set forth
above, the undersigned also emphasizes that the IQ testing
performed when the claimant was 14 was too remote in time and no
longer valid when compared to recent, valid intelligence testing
performed by Dr. Starkey. The undersigned reiterates that the
medical evidence of record does not support marked limitation in the
claimant's daily activities, social functioning, or concentration and
attention (Exhibit I4E). The undersigned finds no basis under the
current record to discount the consultative evaluation of Dr. Starkey.

* * *

The treatment record referenced the claimant's history of intelligence
testing with the Board of School Commissioners of Mobile County in
1992 that revealed his verbal IQ of 70, performance IQ of 52, and full
scale IQ of 57, as well as testing in 1996, when the claimant was 14
years old, that disclosed a verbal IQ of 56, performance IQ of 53, and
full scale IQ of 50 (Exhibit IF). The undersigned also references the
claimant's treatment notations from Kilby Correctional Facility citing his
history of estimated mild to borderline mental deficiency (Exhibit 2F).
The undersigned acknowledges the psychiatric review technique form of
record completed by Joanna Koulianos, Ph.D., in February 2009, in
which the claimant was determined to have marked restriction of
activities of daily living and marked difficulties in maintaining social
functioning (Exhibit 3F). The undersigned has assigned no weight to
such evaluation in that it was too remote in time and was not consistent
with the current medical evidence that supported findings of no greater
than moderate mental limitations.

In reaching her determination of disability, the undersigned has fully
considered all allegations made by the claimant at his hearings
regarding impairments, symptoms, and limitations. The claimant's
allegations of considerably limited activities of daily living are not
supported by or consistent with the overall, objective record which fails

to reflect ongoing medical care and generally normal evaluation findings when treatment has been obtained. The undersigned finds that the objectively demonstrable evidence of record fails to support that the claimant is as impaired as he has alleged. The undersigned notes that no credible treating or consultative physician has opined that the claimant was disabled because of any condition or from any resulting symptoms. The undersigned further recognizes the paucity of medical evidence in this case for complaints surrounding his alleged impairments and finds it reasonable to assume that if the claimant were experiencing difficulties to a disabling degree, he would have presented to his physicians for persistent, regular, and ongoing treatment. The overall record reveals that the claimant has not taken prescription medications specifically for mental health complaints and has not undergone ongoing treatment at a mental health facility or mental health practitioner.

Based on a review of the medical evidence of record, as well as the claimant's testimony at the hearings, the undersigned finds that the preponderance of the evidence contained in the record does not support the claimant's allegations of totally incapacitating symptomatology and that the claimant's statements regarding the severity, frequency, and duration of his symptoms are overstated. The record fails to document persistent, reliable manifestations of a disabling loss of functional capacity by the claimant resulting from his reported symptomatology, and all of the above factors lead the undersigned to a conclusion that the claimant's alleged symptoms and conditions are not of a disabling degree. After considering the entirety of the record, the undersigned concludes that the claimant would not be precluded from performing the requirements of work activity on a regular and sustained basis as set forth in the residual functional capacity statement herein.

 (Tr. 23-25, 27-30).

## V. DISCUSSION

Eligibility for SSI benefits requires that the claimant be disabled. 42 U.S.C.

§ 1382(a)(1)-(2). A claimant is disabled if the claimant is unable "to engage in

any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In evaluating whether a claimant is disabled, the ALJ utilizes a five-step sequential evaluation:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The steps are to be followed in order, and if it is determined that the claimant is disabled at a step of the evaluation process, the evaluation does not proceed to the next step.

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards."

*Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

Orange asserts that the ALJ's failure to properly consider whether his impairment or combination of impairments is of a severity to meet or medically equal the criteria of Listing 12.05C was in error because it is not supported by substantial evidence and not based on proper legal standards. The ALJ found that Orange had the following severe impairments: borderline intellectual functioning, personality disorder, and history of substance abuse, not material. (Tr. 19). After evaluating Orange under Listings 12.02, 12.05, and 12.08, the ALJ stated in her decision that these impairments did not equal the severity necessary to meet the criteria of any listed impairment. (Tr. 19-21). The Commissioner argues that the ALJ did not err because Orange failed to carry his

burden of establishing disability under 12.05 and because substantial evidence supported the ALJ's finding that Orange was not disabled under the Listings.

The Listings describe certain medical findings and other criteria that are considered so extreme as to be presumptively disabling. *See* 20 C.F.R §§ 404.1525, 416.925. To establish disability under a Listing, a claimant must have a diagnosis included in the Listing and must provide medical reports documenting that his condition satisfies the specific criteria of the listed impairment. *See Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002); 20 C.F.R. §§ 404.1525(a-d), 416.925(a-d). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

To "meet" Listing 12.05, the claimant must satisfy the diagnostic description in the introductory paragraph and one of four sets of diagnostic criteria found in paragraphs A, B, C, or D. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A). Listing 12.05's introductory paragraph requires the claimant to have: (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive behavior; and (3) an onset of impairment before age 22. *Id*. at § 12.05. Although adaptive functioning is not defined in the regulations, the Eleventh Circuit has favorably cited the description of adaptive functioning in the Social Security Administration's Program Operations Manual System ("POMS") as "'the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age,'" as well as the

statement in the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders that adaptive functioning means "'how well a person meets standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical.'" *Schrader v. Acting Comm'r of the Soc. Sec. Admin.,* 632 F. App'x 572, 576 & n. 3-4 (11th Cir. 2015) (quoting Soc. Sec. Admin., Program Operations Manual System, DI 24515.056(D)(2) (2012) and DSM-V 37 (5th ed. 2013)).

If the claimant satisfies the three requirements in the introductory paragraph, the claimant must then satisfy one of the four criteria listed in 12.05A through 12.05D. The Listing relevant here is 12.05C. Under Listing 12.05C, the claimant must show both a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*. at § 12.05C. Paragraph C requires an IQ score within a certain range that is valid. The Social Security Administration has noted that standardized intelligence tests can assist in verifying the presence of intellectual disability, but form only part of the overall assessment and should be considered in conjunction with developmental history and functional limitations. *Id*. at § 12.05(D)(6)(a). There is, however, "a rebuttable presumption that a claimant manifested deficits in adaptive functioning before the age of 22 if the claimant established a valid IQ score between 60–70." *Grant v. Astrue*, 255 F. App'x 374, 375 (11th Cir. 2007) (citing *Hodges v. Barnhart*, 276 F.3d 1265, 1266, 1268-69 (11th Cir. 2001)). Significant here, the Court notes that

an ALJ may find, for purposes of Listing 12.05, that the results of an IQ test are not valid, and therefore do not raise the presumption, where the test results are inconsistent with the medical record or the claimant's daily activities and behavior. *Popp v. Heckler*, 779 F.2d 1497, 1499–1500 (11th Cir. 1986); *see also Nichols v. Comm'r, Soc. Sec. Admin.,* No. 16-11334, 2017 WL 526038, *3-4 (11th Cir. Feb. 8, 2017) (holding that the ALJ did not err in finding claimant's IQ score of 59 invalid where her range of activities and accomplishments, including reading and understanding English, having a driver's license, completing high school with a certificate, having a history of some unskilled work, raising two children, and handling money, were inconsistent with the IQ results); *Branch v. Berryhill,* Civ. A. No. 16-0499-N, 2017 WL 1483534, at *4-6 (S.D. Ala. Apr. 25 2017) (finding that the ALJ did not err in finding that claimant's IQ score of 60 was invalid where, even though she was in special education classes through eighth grade (the highest grade completed) and could not functionally read, she could feed and take care of her pets, manage her own personal care, help her husband cook, watch television, wash clothes, go to the grocery store with her husband, talk to her daughter on the phone, and spend time on the computer).

Orange relies on his full scale IQ score of 70 to support his claim that he is disabled under 12.05C. As discussed above, "[a] *valid* IQ score of 60 to 70 satisfies the first prong of paragraph C and creates a rebuttable presumption that the claimant satisfies the diagnostic criteria for intellectual disability." *Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 911 (11th Cir. 2015). "Presumptive disability pursuant to Listing 12.05C is rebuttable, however, and the

Commissioner is charged with determining whether there is sufficient evidence to rebut the presumption." *Tubbs v. Berryhill,* Civ. A. No. 15-00597-B, 2017 WL 1135234, at * 4 (S.D. Ala. Mar. 27, 2017).

Orange was evaluated by psychologist Kenneth R. Starkey. Dr. Starkey administered the Weschler Adult Intelligence Scale, Fourth Edition (WAIS-IV), on which Orange had a full scale IQ score of 70, which placed him at the lower end of the borderline range of intellectual functioning. (Tr. 24). Having evaluated Orange, as well as administered testing, Dr. Starkey opined that his scores appeared to be an accurate estimate of his true intellectual abilities. (Tr. 24). The ALJ granted "great weight" to Dr. Starkey's "mental status findings and intelligence testing." (Tr. 27). Notwithstanding that conclusion, after carefully reviewing the evidence and conducting two hearings, the ALJ, relying on the Eleventh Circuit's holding in *Popp,* concluded that the test administered by Dr. Starkey, which revealed an IQ of 70, was not a valid assessment of Orange's abilities. In *Popp,* 779 F.2d at 1499, the Eleventh Circuit held that the ALJ is "required to examine the results [of IQ testing] in conjunction with other medical evidence and the claimant's daily activities and behavior" to assess whether the testing results are valid.

After reviewing the medical evidence in the record, the ALJ concluded that the record did not support marked limitation in Orange's daily activities, social functioning, or concentration and attention. (Tr. 28). This conclusion was supported by the medical source statement completed by Dr. Starkey in which he concluded that Orange possessed no limitation on his ability to understand and

remember simple instructions and to carry out simple instructions, possessed a mild limitation on his ability to make judgments on simple work-related decisions, possessed moderate restrictions on his ability to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions, possessed a mild limitation on his ability to interact appropriately with the public, possessed a mild limitation on his ability to interact appropriately with co-workers, possessed a moderate limitation on his ability to interact with supervisors, and possessed a moderate limitation on his ability to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 25; 310-11). Dr. Starkey's records also reflected that Orange told him that he could feed, bathe, groom, and dress himself and could manage small amounts of money, prepare simple meals, shop for small items, use a telephone, use a microwave oven, and meet basic transportation needs, all without assistance. (Tr. 314). During his mental status evaluation, Dr. Starkey noted that Orange's motivation for attending to the tasks of the assessment appeared adequate, he was able to focus and sustain attention, with only mild and intermittent distraction from extraneous stimuli, and his attention and immediate and remote memories appeared generally adequate. (Tr. 315).

In his Function Report, Orange indicated that he takes care of his personal needs on his own, does not do chores or cook, sometimes handles his own finances, takes walks, watches television, and plays basketball daily, talks to others on the telephone, and does not have a driver's license, but is able to drive. (Tr. 198-202). The ALJ gave Orange's statements about the frequency, severity,

and extent of his limitations very little weight because she found them to not be supported or corroborated by the overall, objective record. The Court notes that Orange was a young man (31) when he filed his claim for benefits with no physical limitations.

The ALJ specifically considered and relied upon the limitations set forth by Dr. Starkey, a psychologist who evaluated and tested Orange, and the record as a whole in making her determination.  This Court, mindful of the limits of its review, declines to overturn the ALJ's determination that Orange did not meet his burden of proving that his severe impairment of borderline intellectual functioning met the 12.05C Listing.

## CONCLUSION

It is well-established that it is not this Court's place to reweigh the evidence or substitute its judgment for that of the Commissioner. This Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence and based on proper legal standards. The Court finds that the ALJ's Decision that Orange is not entitled to benefits is supported by substantial evidence and based on proper legal standards. Accordingly, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **23rd** day of **February, 2018**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**